NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

R. L. ZEIGLER, INC., Respondent.

No. 18863.

United States Court of Appeals
Fifth Circuit.

Feb. 9, 1962.

Rehearing Denied March 14, 1962.

Stuart Rothman, General Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., National Labor Relations Bd., Washington, D. C., for petitioner.

Mark L. Taliafero, C. V. Stelzenmuller, Birmingham, Ala. (Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, Ala., of counsel), for respondent.

Before RIVES, CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board petitions for enforcement of its order against Respondent R. L. Zeigler, Inc. The order, based upon the Trial Examiner's intermediate report directs the company to cease and desist from discouraging membership in the United Packinghouse Workers of America, AFL–CIO Union, discharging employees or otherwise discriminating against them in their employment because of their union activities, telling employees that union activities prejudice chances of employment, creating the impression that union activities are under surveillance, interrogating employees concerning union activities or promising to assist employees if union activities cease; and it also directs reinstatement

of employee Joseph Mallisham with reimbursement of any loss of earnings he might prove and to refrain from any and all activities in derogation of Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.

A review of the entire record discloses, contrary to the Company's contentions, that there was substantial evidence to support the report of the Trial Examiner and the decision and order of the Board with the modifications hereinafter defined. Universal Camera Corp. v. National Labor Relations Board, 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

The pertinent facts found by the Trial Examiner are as follows: The Company, engaged in the slaughtering of livestock and processing of meat products, first recognized the United Packinghouse Workers of America, AFL–CIO Union in July, 1958, and a month later a strike occurred. As part of the agreement settling the strike, respondent agreed to place striking employees who could not immediately be returned to work on a preferential hiring list for one year. In December, 1959, Ralph Vaughn, who was on this list but had not been recalled during the year, applied to John W. Bell, Company Manager, for re-employment, but Vaughn was denied employment because of his union activities. September 20, 1959, a Company superintendent asked one of the employees why he continued to pay union dues since the union was not going to do him any good, as it was not going to last long. The superintendent concluded by promising the employee help. January, 9, 1960, Sarah Hargle, who had never before worked for Respondent, applied to Bell for a job and Bell advised her that he had no opening at that time, but might be able to use her later. Bell then asked Hargle what she "had to do with the Union in Gordo," and he also inquired whether her husband was a union man.

Joseph Mallisham was first employed by the Respondent in 1945. By 1958 he was one of the five highest paid employees in the plant, and his immediate foreman said he "never had complaints about Mallisham's production". Mallisham was "one of the most, if not the most, active union member" at the Respondent's plant. He was a department steward, a member of the grievance committee, a member of the negotiating team, secretary of the plant local, and had been a strike captain and chairman of the strike finance committee.

In July, 1959, there was a dispute between Manager Bell and the employees of the pork department concerning morning break periods, Mallisham heard that department steward James Long had been ordered to report to Bell. Mallisham then told his foreman that he was leaving his post on union business, was docked for the time, and went with Long to see Bell. Mallisham informed Bell that, under the contract, the dispute should be settled with the grievance committee rather than by calling in a single employee.

In September, 1959, Mallisham was informed by another employee that a foreman was doing production work in the kill department, although under the contract foremen were not to engage in production work when regular production employees were in laid-off status. After speaking to supervisors at the kill department and being told by them to see Bell, Mallisham went to Bell and protested, stating that there was a laid-off employee from the kill department in the plant at that time seeking work. Mallisham was told to go back to the department and interview each employee as to his feelings about the foreman doing production work in such circumstances. Mallisham did so, and reported back that all the employees had opposed the foreman's working, but Bell did nothing about it.

February 4, 1960, Mallisham was told to report to the manager's office, and Bell there charged that the three employees present at the meeting had not signed the dues check-off cards that Mallisham had turned in a week before, implying that their names had been forged. Bell discharged Mallisham and, within thirty minutes, Mallisham had his severance check. Later during the day, at a meeting Bell told the union grievance committee that Mallisham was being dis-

charged for being insubordinate and for his union activities on company time over a long period, in addition to the incident of the alleged forged check-off cards.

The questions presented by this record relating to these alleged violations of §§ 8(a) (1) and 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (1, 3), are questions of fact. Their solution does not depend upon any close or challenged principles of law.

■ The Respondent emphasizes the culpable attitude and actions of the Union and its members, as reflected in the order entered by the Board against the Union after it had denied a joint application for withdrawal of the charges, and as enforced by us in National Labor Relations Board v. United Packinghouse Workers of America, AFL–CIO, et al, 5 Cir., 1960, 274 F.2d 816. The General Counsel, on the other hand, points out evidence before us of anti-union bias on the part of the Respondent here. The facts relating to each of the foregoing charges are close, and a finding in favor of either party would probably have been entitled to affirmance. No two of these cases involving the multiple subleties of labor relations are likely to turn up with the same facts. Each case must, of course, be resolved on its own peculiar facts.

We adverted to the exacting nature of the duty imposed upon us by the manifold cases which come before us based upon labor-management relations, in our recent case of National Labor Relations Board v. Walton, infra, in these words (286 F.2d at p. 19):

"As we must do in these 'substantial evidence' cases, we have undertaken the tedious task of reading the record and reviewing the evidence; tedious because of the necessity of going from the Board's appendix to the employer's appendix, and so back and forth from one to the other, in an effort to piece together the isolated excerpts of testimony which each party has extracted for the purpose of supporting the position for which it contends."

■ After making this tedious examination we are constrained to hold that, considering the background evidence, the recitation by the witnesses of what transpired in this particular case, and considering also that the Trial Examiner and the Board found the charges of unfair practice as to ten employees unsupported by the evidence and dismissed them, we hold that the order encompassing the violation of the two sections of the National Labor Relations Act now before us is sustained by substantial evidence in the record as a whole and ought to be enforced.

■ While no specification of error was formally assigned on the point, the Respondent on the argument insisted that the order contained unauthorized requirements [1] and was too broad.[2] But no exception or objection of any kind was made by Respondent either to the Examiner's proposed order or the Board's final order concerning these matters. Consequently, we have no power to alter or modify the order. N. L. R. B. v. Plumbers Local 476, 1962, 82 S.Ct. 423, No. 39, January 15, 1962, reversing, per curiam, 280 F.2d 441, 283 F.2d 26 (1 Cir. 1960), on authority of N. L. R. B. v. Ochoa Fertilizer Corp., 1961, 82 S.Ct. 344, Dec. 18, 1961, and N. L. R. B. v. Cheney California Lumber Co., 1946, 327 U.S. 385, 388, 66 S.Ct. 553, 90 L.Ed. 739.

Order enforced.

CAMERON, Circuit Judge, dissenting.

Rehearing denied; CAMERON, Circuit Judge, dissenting.

---

[1] It pointed to the phrase "creating the impression" of surveillance in Par. 1(b) condemned by us in N. L. R. B. v. Walton Manufacturing Co., 5 Cir., 1961, 286 F. 2d 16, 21.

[2] It pointed to the phrase "any other labor organization" in Par. 1(c) criticized by us in N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 5 Cir., 1961, 293 F.2d 300, 310; and more so to the clause "In any other manner interfering with, restraining or coercing its employees in the exercise of their" rights. See N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, 436, 61 S.Ct. 693, 85 L.Ed. 930; N. L. R. B. v. Great Atlantic & Pacific Tea Co., 5 Cir., 1960, 277 F.2d 759, 765.